UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Marty W. Crandall, | No. 2:23-cv-03043-KJM-CSK |
| Plaintiff, | ORDER |
| v. | |
| Teamsters Local No. 150 and Dale Wentz, | |
| Defendants. | |

Marty W. Crandall, the plaintiff in this action, alleges Teamsters Local No. 150 (the Union) and Dale Wentz, the Union's principal officer, ousted him from his position as an elected Union business agent in violation of federal and California law. Wentz and the Union argue Crandall's claims are legally defective and seek judgment on the pleadings. As explained in this order, the court agrees and **grants** the motion.

I.     BACKGROUND

As summarized in a previous order, Crandall alleges he served as an elected Union business agent until November 2023, when Wentz told him the Union was dropping him from the "slate" of candidates running together for reelection the next month. *See* Prev. Order (Aug. 20, 2024) at 2, ECF No. 18.  Wentz told Crandall he was "moving in a different direction." *Id.* (quoting Compl. ¶ 25, ECF No. 1).  Crandall believes Wentz was retaliating against him because Crandall had complained about misconduct by another business agent, Perry Hogan, who Wentz

1

1    wanted to protect from any investigations or allegations of wrongdoing.  *See id.* at 2–3.

2    According to Crandall's complaint, Wentz waited to surprise him with his exclusion from the

3    slate until just a month before the election, which virtually guaranteed Crandall would not be

4    elected; he would have no time to build support, raise money and otherwise compete before

5    voting began.  *See id.* at 2.  Crandall decided not to run.  *See id.*

6         Crandall claims Wentz ousted another business agent as well—his friend Kelli Pitpit—by

7    similarly excluding her from the slate at the last minute, again because Wentz wanted to protect

8    Hogan.  *See, e.g.*, Compl. ¶¶ 26, 50.  She, like Crandall, did not seek reelection.  *See id.*

9         Crandall filed this lawsuit against the Union and Wentz in December 2023.  *See generally*

10   *id.*  He alleged they violated the Labor Management Reporting and Disclosure Act of 1959

11   (LMRDA), California and federal laws prohibiting age discrimination, and California laws

12   prohibiting retaliation against whistleblowers and terminations in violation of public policy.  *See*

13   Prev. Order at 3.  Pitpit filed a similar complaint about a month later.  *See* Pitpit Compl., Case

14   No. 24-321, ECF No. 1.[1]  The court found the two cases were related and formally related them

15   by court order.  *See* Related Case Order, ECF No. 12.  Both cases are pending.

16        In August 2024, the court granted Wentz's and the Union's motion to dismiss Crandall's

17   complaint in part.  *See* Prev. Order at 9–10.  The court partially dismissed Crandall's first claim,

18   under the LMRDA, to the extent he was relying on section 609 of that law.  *See id.* at 6–7.  The

19   court did not decide whether Crandall had stated a claim under sections 101(a)(1) and (2) of the

20   LMRDA because the parties' briefs did not address those sections.  *See id.* at 7.  As for the age

21   discrimination claims, it was impossible to infer from Crandall's allegations that he had been

22   discharged or faced some other "adverse employment action," so the court dismissed those claims

23   as well.  *See id.* at 8.  Crandall did not address his whistleblower and wrongful termination

24   claims, so the court dismissed those claims as abandoned.  *See id.* at 9.  Finally, the court

25   permitted Crandall to file an amended complaint, but he has not done so, which means his case at

26   this point is proceeding solely on his first claim, under section 101(a) of the LMRDA.

---

[1] Unless otherwise noted, record citations refer to documents filed in Crandall's case, No. 23-3043.

1    In the related case by Kelli Pitpit, Wentz and the Union also moved to dismiss the complaint. The court granted that motion in February 2025. *See* Pitpit Order, Case No. 24-321, ECF No. 22. As was true of Crandall's complaint, Pitpit's complaint did not permit the court to infer she had been discharged or had suffered an "adverse employment action." *See id.* at 8–9. This meant she could not assert viable claims of age discrimination, whistleblower retaliation or wrongful termination. *See id.* at 8–11. In contrast with Crandall's case, however, the parties in Pitpit's case did address sections 101(a)(1) and (2), so the court reached their dispute about those sections. *See id.* at 7–8. The court dismissed the claim. Pitpit's exclusion from the slate of electors was not an "adverse action" under the LMRDA; the court could not conclude otherwise without deviating "from the LMRDA's text as well as applicable caselaw." *Id.* at 8. And although Pitpit's exclusion from the slate of candidates "likely diminished her chances of re-election," the court concluded that union members' "LMRDA rights do not include the right to hold or be re-elected to office," but rather the "right to run, period." *Id.* (citing *Local 115, United Bhd. of Carpenters and Joiners of America v. United Bhd. of Carpenters and Joiners of America*, 247 F. Supp. 660, 662 (D. Conn. 1965)). The court permitted Pitpit to amend her complaint, which she has now done. *See generally* Pitpit First Am. Compl., Case No. 24-321, ECF No. 23.

Wentz and the Union now seek judgment on the pleadings in Crandall's case and move to dismiss in Pitpit's case. *See* Mot., ECF No. 25; Mot. Dismiss, Case No. 24-321, ECF No. 24. The court addresses the defendants' motion to dismiss in the *Pitpit* case in a concurrently filed order and addresses only Crandall's complaint in this order. As summarized above, the only claim remaining in this case is Crandall's first claim, under section 101(a)(1) and (2) of the LMRDA. Wentz and the Union argue the court's reasoning and its order in Pitpit's case apply just as well in this one. *See* Mot. at 8–10. Crandall opposes the motion, ECF No. 27, and defendants have replied, ECF No. 28. The court took the matter under submission without holding a hearing. *See* Min. Order, ECF No. 33.

**II.    DISCUSSION**

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion is in many

3

circumstances "functionally identical" to a motion to dismiss for failure to state a claim under Rule 12(b)(6); when it is, as is true in this case, the same standard of review applies. *Gregg v. Hawaii, Dep't Public Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011)). Under that standard, a plaintiff must support each claim for relief with factual allegations that, assumed true, allow a plausible inference of the defendant's potential liability. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### A. Subject Matter Jurisdiction

As was true when the court issued its previous order, it is necessary to begin by carefully distinguishing Titles I and IV of the LMRDA. Title I "provides union members with an exhaustive 'Bill of Rights' enforceable in federal court." *Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley*, 467 U.S. 526, 536 (1984). "Title IV, in contrast, provides an elaborate postelection procedure aimed solely at protecting union democracy through free and democratic elections, with primary responsibility for enforcement lodged with the Secretary of Labor." *Id.* at 528. Congress intended "to consolidate challenges to union elections with the Secretary of Labor, and to have the Secretary supervise any new elections necessitated by violations of the Act." *Id.* at 543. But Title IV does not preempt post-election Title I claims if they "do not directly challenge the validity of an election already conducted." *Id.* at 541 n.16. A claim is preempted when the plaintiff requests relief that will "interfere with the operation of a union pursuant to an already-conducted election" and the plaintiff can obtain relief "for the type of injury he or she claims to have suffered" under Title IV. *Casumpang v. Int'l Longshoremen's & Warehousemen's Union, Loc. 142*, 269 F.3d 1042, 1057 (9th Cir. 2001). For deciding whether a claim is preempted, "the crucial inquiry is whether a union member has been discriminated against in the exercise of his Title I rights." *Kupau v. Yamamoto*, 622 F.2d 449, 455 (9th Cir. 1980).

The distinction between preempted and permissible claims is sometimes difficult to discern. A few cases illustrate the distinction in practice. *Davis v. Turner* is an example of a preempted claim. *See generally* 395 F.2d 671 (9th Cir. 1968). In *Davis*, the plaintiff was

4

nominated as a delegate to a union convention. *Id.* at 672. His eligibility to serve as an elected delegate was challenged, and after the union sustained this challenge, the plaintiff's name was removed from the election ballot. *Id.* The plaintiff claimed the union had violated his Title I rights, and he brought a federal complaint in which he asked the district court to invalidate ensuing election. *Id.* The Ninth Circuit affirmed the district court's order granting summary judgment to the defense in a short and straightforward application of the preemption rule. *Id.* Once a union election has concluded, "[n]o individual suit to set aside a union election may be maintained." *Id.*

But not all post-election claims are preempted. *Kupau* is an example of a proper post-election claim under Title I. 622 F.2d at 451–52. In *Kupau*, a union's election committee determined the plaintiff was eligible to run for a union office. *Id.* at 452. He won against the incumbent officer. *Id.* But soon after the election, the incumbent challenged the plaintiff's eligibility to run. *Id.* The union reconsidered the plaintiff's eligibility and decided to disqualify him. *Id.* The plaintiff and then sued the union, alleging Title I violations and requesting an "injunction order requiring [his] installation" in the office he had won. *Id.* at 452–53. The Ninth Circuit held this claim was not preempted because the plaintiff's "Title I claim rest[ed] upon the alleged inconsistency between the union's conduct before and after the election," rather than the conduct of the election itself. *Id.* at 456. The circuit affirmed the district court's preliminary injunction ordering the plaintiff's installation. *Id.* at 451–52.

*Casumpang* is another example of a proper Title I post-election claim. *See* 269 F.3d at 1063. After the plaintiff won an election to be a business agent, the union told him it would need to hold a new election based on its findings about his employment history. *Id.* at 1045–46. The union also suspended the plaintiff's status as a member in good standing, which prevented him from running in the new election. *Id.* at 1047–49. The plaintiff decried the union's actions as "an attempt to selectively prosecute [him] as a result of [his] election." *Id.* at 1047. In his federal lawsuit, he alleged the union had "removed him from his elected position as Business Agent and suspended his membership . . . in retaliation for his exercise of his free-speech activity contrary to the protection guaranteed to union members by Title I." *Id.* at 1050 (citation and quotation marks

5

omitted). He requested to be reinstated as a member of the union. *Id.* at 1051–52. The Ninth Circuit found that Title IV did not preempt the plaintiff's claims because he did not "seek reinstatement to the position of Maui Division Director, nor declaratory or injunctive relief related to the validity of the 1998 rerun election." *Id.* at 1057. Because the requested relief would "not interfere with the operation of the Local pursuant to the outcome of the 1998 rerun election," the district court had subject matter jurisdiction to hear his claim under Title I. *Id.*

To summarize, the plaintiff's claims were preempted in *Davis* because he alleged the union's actions were erroneous, not discriminatory, and because he sought to overturn the election directly. But the holding in *Davis* does not show every post-election claim is preempted, as the court's opinions in *Kupau* and *Casumpang* show. *Kupau* further shows federal district courts have jurisdiction to preserve a plaintiff's past appointment to a specific position—but only insofar as that plaintiff is actually alleging a discriminatory removal from that position, rather than challenging the election procedure itself. *Casumpang* shows a plaintiff can avoid preemption by limiting his requests for relief, such as by asking the court to reinstate him as a union member and not to invalidate the union election itself.

Applying the lessons from these cases, this court may consider Crandall's claims only insofar as he alleges discrimination, and only insofar as he asks this court to remedy that discrimination without overturning the election results. *See, e.g.*, *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973) (federal courts have jurisdiction over cases "abridging both Title I and Title IV" where the alleged union action was "part of a purposeful and deliberate attempt . . . to suppress dissent within the union."). Other claims and allegations—such as Crandall's allegations about the difficulties of mounting an independent campaign, the practical challenge of getting his name on the ballot or the election-related effects of his removal from the slate of candidates—are preempted by Title IV; any claim making these challenges targets the Union's election procedures, not discrimination, even if framed by allegations of Wentz's retaliatory motives. *See generally, e.g.*, *Reich v. Loc. 396, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 97 F.3d 1269 (9th Cir. 1996) (adjudicating under Title IV a dispute about a slate of independent candidates and their access to information about

6

union members); *see also, e.g.*, *Bradley v. Am. Postal Workers Union, AFL-CIO*, 962 F.2d 800, 802 (8th Cir. 1992) (finding retaliation claims "clearly" preempted because plaintiff alleged he was "deprived of the right to a fair election and the right of participation").

### B. Judgment on the Pleadings

Crandall relies on two subsections of the LMRDA: 101(a)(1) and (a)(2). Under subsection (a)(1), union members "have equal rights and privileges" within the organization "to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws." 29 U.S.C. § 411(a)(1). Union members can state a claim under this subsection by alleging they were denied a right "accorded to other members." *Ackley v. W. Conf. of Teamsters*, 958 F.2d 1463, 1474 (9th Cir. 1992) (collecting cases).

Subsection (a)(2) grants union members several specific rights, including "the right to meet and assemble freely with other members," the right "to express any views, arguments, or opinions" and the right "to express at meetings of the labor organization [their] views, upon candidates in an election of the labor organization or upon any business properly before the meeting," but again in each instance "subject to the organization's established and reasonable rules pertaining to the conduct of meetings." 29 U.S.C. § 411(a)(2). Union members can state a claim under this subsection by alleging (1) they "exercised the right to oppose union policies," (2) were "subjected to retaliatory action" and (3) "the retaliatory action was 'a direct result of [their] decision to express disagreement' with the union's leadership." *Casumpang*, 269 F.3d at 1058 (quoting *Sheet Metal Workers' Intern. Ass'n v. Lynn*, 488 U.S. 347, 354 (1989)).

To the extent Crandall's complaint can be interpreted as asserting a discrimination claim, there are only two plausible ways to read it. On the one hand, his complaint can be read as alleging he was wrongly deprived of an elected position before the election had even occurred. *See, e.g.*, Compl. ¶ 55 (alleging competing for election was "hopeless and futile" after Crandall was dropped from the slate). As discussed in this court's order dismissing Pitpit's similar claims in the related case, the language of subsections (a)(1) and (2) does not imply a union member has

7

a right to be elected to a particular position within the union's leadership. *See* Order (Feb. 6, 2025) at 8, Case No. 24-321, ECF No. 22.  Cases interpreting subsections 101(a)(1) and (2) show those sections deal instead with direct harms and demotions enacted by the union, such as fines, revocations and suspensions of union memberships, and removals from elected positions after the fact. *See id.* at 7–8 (citing *Lynn*, 488 U.S. at 354; *Casumpang*, 269 F.3d at 1059; and *Salzhandler v. Caputo*, 316 F.2d 445, 448 (2d Cir. 1963)).  Crandall could have run for reelection, but did not.  His claims about a "hopeless and futile" campaign are preempted challenges to the union's election procedures and rules.

On the other hand, Crandall's complaint could be read as alleging he was deprived of a right to be affiliated with the winning slate of candidates.  *See, e.g.*, Compl. ¶ 54[2] (alleging defendants "violated LMRDA by dropping Plaintiff from a nominating slate of Business Agent candidates").  Subsections (a)(1) and (2) do not imply any one union member has a right to be affiliated with other union members who object to that affiliation.  *See* Order (Feb. 6, 2025) at 8, Case No. 24-321, ECF No. 22.  Crandall cites no cases interpreting the LMRDA in this way.  This court's own searches also have yielded none.  The Supreme Court has instead written that the LMRDA allows union leaders to choose who they will work with to manage the union's affairs, even if the choice can sometimes pose "a dilemma for some union employees" who find themselves on the opposite side of a political divide.  *See Finnegan*, 456 U.S. at 442.  For these reasons, Crandall does not state a claim under subsection 101(a)(1) or (2).

Crandall advances two arguments to the contrary.  First, he contends the Ninth Circuit has interpreted a different part of section 101, subsection (a)(4), as permitting union members to file lawsuits challenging "a wide array of disadvantageous changes in the workplace."  Opp'n at 7 (quoting *Ray v. Henderson*, 217 F.3d 1234 (2000)).  The decision he cites, however, was not about union elections or the LMRDA, but rather Title VII of the Civil Rights Act of 1964 and whether an employer had subjected its employee to an "adverse employment action" under that law.  *See Ray*, 217 F.3d at 1240 (citing 42 U.S.C. § 2000e-3(a)).  The circuit held in *Ray* that the defendants had in fact taken an adverse employment action against the plaintiff: his supervisors

---

[2] The language quoted here is found in the first of the two paragraphs numbered 54.

8

had (1) halted a program that allowed employees to bring concerns to the attention of management, (2) eliminated a flexible start-time policy that had allowed him to start work half an hour early, which had given him time to care for his ailing wife, (3) instituted an arbitrary, burdensome and inconvenient lock-down procedure and (4) reduced the plaintiff's pay. *Id.* at 1237–38, 1243–44 & nn.1–2. Crandall makes no similar allegations here.

Second, Crandall argues Wentz's actions deprived union members of a "meaningful vote" in the upcoming election in violation of the LMRDA, citing an opinion by the District of Columbia Circuit. Opp'n at 8 (quoting *Bunz v. Moving Picture Mach. Operators' Prot. Union Loc. 224*, 567 F.2d 1117, 1122 (D.C. Cir. 1977)). In *Bunz*, the circuit court interpreted section 101(a)(1) as requiring more than "the mere naked right to cast a ballot." 567 F.2d at 1121 (citation and quotation marks omitted). Each member must have not only a vote, but a "meaningful" vote. *Id.* (citation omitted). The circuit held the union had not ensured its members' votes were "meaningful" because it had conveniently and frivolously reinterpreted its voting rules after the votes had been cast. *See id.* at 1122 ("Like other members who opposed the assessment, [the plaintiff] was allowed to cast a ballot; yet the minority's ballots were deprived of their effectiveness when the union, by issuing a patently frivolous interpretation of its constitution, raised the percentage of votes required to defeat the assessment from 34% to 51%."). Crandall does not accuse the Union in this case of any similarly discriminatory action. Even when his allegations are viewed in a favorable light, as they must be in the context of the instant motion, they convey instead that Wentz changed his allegiances at an advantageous moment in an effort to protect his friend, Hogan. The Union's leadership did not manipulate a vote or take another discriminatory action, unlike the defendants in *Bunz*.

Crandall's arguments about the circuit court's opinion in *Bunz*—as well as other portions of his opposition—imply he interprets that decision as permitting broad challenges to union election procedures under section 101(a). *See, e.g.*, Opp'n at 5 (criticizing use of candidate slates); *id.* at 9 (arguing Union "cleverly avoided collecting emails or text numbers for its members" and "maintained antiquated and error-infested mailing lists"). The court declines to read *Bunz* or section 101(a) so broadly. Doing so would lead to an order beyond this court's

9

jurisdiction to issue, as explained in the previous section and in this court's previous order. *See* Prev. Order at 5 ("To the extent plaintiff challenges the Union's election procedures and the election itself, the court does not have jurisdiction." (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 532 (1972))).

Finally, in support of his arguments about "meaningful" votes, Crandall cites the Seventh Circuit's opinion in *McGinnis v. Local Union 710, International Brotherhood of Teamsters*, a case about a union bylaw provision that forced out-of-town members to vote in person rather than by mail. *See* Opp'n at 10 (citing 774 F.2d 196 (7th Cir. 1985)). "The practical effect" of this bylaw was "similar to the imposition of a graduated poll tax upon Union members living outside the Chicago area." *Id.* at 201. In the Seventh Circuit's view, the bylaw provision violated section 101(a)(1). *See id.* at 201–03. Crandall does not explain why an in-person voting rule is similar to Wentz's decision to knock Crandall off his slate. Nor does Crandall explain how Wentz's actions were "discriminatory" in the relevant sense. *McGinnis* does not offer any insights about the potential viability of Crandall's claims.

In sum, Crandall's allegations show neither that he was denied a right the Union had "accorded to other members," *Ackley*, 958 F.2d at 1474, nor that defendants subjected him to the sort of "retaliatory action" that can support a claim under section 101(a), *Casumpang*, 269 F.3d at 1058.

### III.   CONCLUSION

The motion for judgment on the pleadings (ECF No. 25) is **granted**. The Clerk's office is instructed to **close the case**.

IT IS SO ORDERED.

DATED: June 18, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE

10